Good morning, Your Honors. Donald Thompson for the Defendant Appellant, Lantah, LLC. Why don't you wait just for a second until they get unloaded? I can't settle. Forgive me. Okay. I'd like to reserve half my time for rebuttal. All right. If you'll watch your time, I'll also try to help you. Okay. Thank you. A trademark resides in the mind of the public, and it protects goodwill that has been earned in the marketplace. A trademark cannot exist until it has been applied to a product that has been sold to consumers or associated with services that have been rendered to consumers. In 1946, Congress enacted the Lanham Act to codify and unify the common law of trademarks and unfair competition. In 1988, Congress amended the Lanham Act, among other reasons, to provide certainty, predictability, harmony, and fairness when establishing trademark rights. By filing an intent-to-use application, Lantah, LLC, took advantage of the procedure that Congress had provided in order to ensure the outcome that Congress had intended, certainty, predictability, harmony, and fairness in the establishment of trademark rights. Now, Telegram is the plaintiff in this case, and the movement on this motion, Telegram has the burden of making a clear showing that it is entitled to the extraordinary remedy of a preliminary injunction. And I do not understand how Telegram might have made that showing on this motion, considering the text, structure, history, purpose, administrative interpretation, and legislative intent behind the defined term, use in commerce in the Lanham Act, particularly considering the legislative intent behind the Trademark Law Revision Act of 1988. Well, one of the things that sort of weaves in and out of the briefing by both parties, of course, is the issue of priority. And there seemed to be some implication in some of your briefing where you seem to indicate that your client had used this gram mark before your opponents here, before the Telegram messenger. Do you take that position that Lanta has used the gram mark in commerce before Telegram? Telegram, I should say. Lanta had certainly used it in public before Telegram. You used it on the website, at least. I'm not taking the position on this appeal that Lanta made a use in commerce within I just wanted to clarify. So you're not claiming that Lanta made a use in commerce? Not within the statutory definition, no. And but we made a public use, a public-facing use, and that's an important distinction, because consumers saw our use, you know, on our website. And that's what we intended. Do you claim that use on the, just putting it on your website, is in commerce? No, Your Honor. Oh. No. So you agree that they were in commerce with their mark before you were in commerce with your mark? Well, no. We don't think they've made a use in commerce. I mean, your argument, as I understand it, is that these contracts without the ability yet to deliver the services are not yet a use in commerce. That's correct, Your Honor. We don't believe they've made a use in commerce. And we certainly don't believe they made a use in commerce prior to our application filing date. And the reason is because they hadn't applied the mark to a product or rendered a service. But there's a substantial amount of money that was gained by your opposition just selling the rights to use the mark. I mean, we're talking about hundreds of thousands of dollars were invested in this market in your client's program. Were they in commerce when that happened? Sorry, I'm not sure I understand. Well, it seems to me that it's rather striking that the mark was published by people all across the world. The mark was put on the market for sale, and they got huge returns. And I'm just suggesting, the question is, was that something that was done in commerce? Are they in commerce when that happens? Now referring to telegrams, investment contracts? Yes. No, Your Honor, because that's fundraising. What they're doing is they're raising money in order to offer a cryptocurrency at some point in the future. And it's clear from the text of the defined term, use in commerce, that the services must have been rendered in order to have a use in commerce. Well, we do have cases where pre-sales activity constitutes use in commerce, correct? Well, yes. Yes, there are. And that's why the court's supposed to look at the totality of the circumstances, correct? Keeping in mind the statutory text, the latest case on that is reared in commerce from the Ninth Circuit. And before that, there's Chance. Chance, right. Yes, in New West and so forth. So there are two avenues, potentially. I'm not sure we get that far into the case. All we're talking about here is a preliminary injunction. Yes, Your Honor. And all we are going to decide here is whether or not the district court should be overturned by saying that he thinks that the other side's got a better chance at winning than you do. And we're not even going to have to decide the issues of law. So where are we on that? Where did the district judge, where can you say the district judge was wrong that we should overturn his finding that he thinks that it's more reasonable that your adversary is going to win in the final rounds of the case than you are? Well, first of all, the standard of review here, you know, in our review, and it seems the other side has conceded this point, is de novo review. And so I think you take a fresh look at the record. And second of all, I think simply based upon the plain text of the statute. Well, you understand that our standard of review for a preliminary injunction is far different from our standard of review when we have the actual case before us. Fair enough, Your Honor. We think we've presented legal issues, issues of statutory construction. Let's start with the standard of review, because standard of review for us is abuse of discretion on a preliminary injunction. Although I recognize that if there's legal infirmities, then that might per se be an abuse of discretion. But then that gets more complicated when you fold back in the further question on serious issues. If there's even serious legal issues, you may well be able to pass the threshold on a preliminary injunction. So with those standards which we are looking at, how do you get over that standard to reverse the district court? And I just want to, I'll let you answer that, but I do want to let you know you've got six minutes. I appreciate that. The answer, again, has to do with the Trademark Law Revision Act and the intent of that act. And the case I would refer to here is Warner Vision out of the Second Circuit, which we cited. There's also a case out of the D.C. Circuit, which is on point. That's Fame Jeans cited in our reply. What Warner Vision says, in effect, is to enjoin an intent-to-use applicant under these circumstances would vitiate the purpose of the statute. In order to perfect its rights, my client needs to make a use in commerce. And if my client is enjoined, which it currently is, it can't make a use in commerce, can't perfect its rights. And this vitiates the purpose behind the intent-to-use provisions in the Lanham Act. And I think Warner Vision makes that clear, and the Fame Jeans case does as well. And with that, I'll reserve the balance of my time. Thank you. Thank you. Good morning. May it please the Court, John Newcomb for the Appellee Telegram. With me today is my colleague, David Lamb. Whatever is useful to the Court in our briefing probably came from Mr. Lamb. I'd like to start by addressing a few comments from my friend, Mr. Thompson, for the appellant. First of all, we've heard the comment that Lanta filed its intent-to-use application in order to enjoy the benefits of the TLRA in 1988. That may be true, but the law is also clear that a prior use in commerce of the disputed mark trumps a later-in-time ITU application. The ITU is a placeholder. It would not displace or disturb preexisting common law rights in the mark, which is exactly what we are alleging and what Judge Breyer made detailed fact findings of in this case. Second. Well, so, taking as valid the point you just made, then your case turns on, I think, whether or not, in my view, district court erred, in essence, in holding that what you did amount to first use, right? Isn't that the district court's conclusion or finding? And that was based upon these orders you took. That's all there is. I think that's mostly right. If I may, I would tweak that just a little bit, Your Honor. And going back to Judge McEwen's comment about the standard of review. We know from the Hurd-Reed decision from 2013, which I think Her Honor authored, the standard of review here is an abuse of discretion. It is limited and deferential. That is the language of this court. When we are reviewing Judge Breyer's underlying decision, there is a de novo review about the legal framework used by the district court. We don't dispute that. There is also, however, a review of the underlying fact findings. Those are reviewed for clear error. That is a deferential standard of review. Now, on this appeal, Lanta has presented it to this court as involving numerous questions of law. And I understand that position. It's a savvy appellant approach to this court. However, most of those arguments can be disposed of with a proper appreciation for the fact findings made by Judge Breyer. And, Your Honor, I am trying to be responsive to your question. Here's what I mean by that. Judge Breyer did not just look at the purchase agreement activity that my client engaged in. Although, to be clear, that evidence is massive. We have $850 million of executed transactions, money received, vested subscription rights granted. That's from how many persons or how many? Does the record show how many orders that were? So I believe the record evidence suggests the following. For the initial tranche of $850 million in sales made by my client, all of which occurred  How many people placed those orders? That was 81 people. 81? 81 people or organizations. But you're saying 81 orders, which are, you know, you could classify them as secret. At least they were told they were confidential. 81 secret orders never delivered a sufficient amount of use in Congress. I mean, that's, at bottom, what your case is, I think. Well, it's just a little more than that, Your Honor. I don't think so, but tell me what more there is. So going back to Judge Breyer's fact findings, he didn't just find that we had made $850 million in sales to 81 organizations or people, including folks in Delaware, California, Colorado, Illinois, New Jersey, Massachusetts. Well, it's still just 81 orders, but what else is there? There was additional ongoing commercial activity after the ITU filing date, which is relevant to the ongoing commercial use of the mark. Well, it's after the filing date. That's right. Although some of the case law suggests that small sales, which can be initially used to peg a priority date, can be credited if they are followed by ongoing growing commercial activity. I wouldn't call an $850 million ledger a small sale, but there are, in the case law, considerations of post-initial priority date activity. Beyond that, Your Honor, Judge Breyer also made fact findings that we had engaged in extensive development and commercialization activity. His Honor cited that with pin sites in his decision. He also noted that Lanta had, A, not attempted to undermine or challenge that evidence, and, B, adduced no such evidence for their own part. He also cited, too, including again with pin sites, numerous trade publications identifying Telegram, its cryptocurrency, and the Gram mark in particular. He furthermore made a fact finding that my client had developed brand recognition in the Gram mark. And again, we're in the position where the appellant is asking this court for a de novo review of legal issues, and they are telling this court that, for example, in every instance you must have a wide public association between the mark and the service. I think respectfully that's wrong on the law, and we can get there if we need to. But as an initial matter, that argument doesn't get this appellant anywhere, because we have fact findings. Can I tell you what's bothering me? Is this back and forth between the parties on totality, the test of totality. So as I understand it, you say, well, they waived the totality test. And then they say, well, we didn't actually waive it. I mean, if there's insufficient sales, then the totality should have been the test applied by the district court. But the district court didn't apply the totality of circumstances test. So why shouldn't we send it back and let the district court apply that? I wrestled with that question a bit, Your Honor. It goes right to the heart of this appeal. There are a number of reasons why this Court should not send it back on that basis. First of all, this argument was never presented to Judge Breyer. Judge Breyer never even had an opportunity to consider it and make a ruling on it. Now, it is true that both parties addressed the totality test before Judge Breyer. For example, on supplemental record pages 35 through 37, you can see Lanta's 14, you can see in our reply brief before Judge Breyer that we also addressed the totality test. So both parties addressed the totality test before Judge Breyer. However, neither party took the position that it was required in every instance. That argument made prominently to this Court, including with a citation to the Reardon case, was never made to Judge Breyer. In fact, the Reardon case wasn't even cited by anybody to Judge Breyer. That's why we see in his Honor's opinion, he basically says, look, the parties have two disputes. One, were there actual sales to establish a use in commerce? And number two, in the alternative, should I look at the totality test? And he made a pretty express and in the context of the briefing papers before him, perfectly sensible decision that he didn't even have to get to the totality test. So that then loops back to if the nature of the sales, which Judge Tashima points out are in effect, confidential private sales, if the nature of the sales is not enough to get you past the finish line, you then argue that there's additional activity that in effect relates back and it all comes as a package, which does, of course, implicate the totality of circumstances test. So how does that figure in? It would, Your Honor, but for two things. Number first, I would just again supplement Judge Tashima's recitation of the relevant facts that it's not just the execution of the purchase agreements. It's the other fact findings of Judge Breyer surrounding the negotiation and execution of those agreements, the public press, the brand recognition, the extensive development commercialization efforts. And that's before the court in the opening pages of the record evidence. It's Judge Breyer's opinion. Second, even if this appellant had given Judge Breyer an opportunity to rule on this issue, which they didn't, it still shouldn't be sent back on that basis for a number of reasons. First, the law does not support the idea that the totality of circumstances test should be applied in every case. If you look at the Sengoku Works decision from the Ninth Circuit in 1996, if you look at the Shield versus Otter production decision from Southern District of California in 2014, later affirmed by this court, the first inquiry is whether you can show a use in commerce through actual sales. That is consistent with the statutory language and also common sense to use a mark in commerce if you're using or displaying the mark through the sale of goods or services. Second. But how do you, it seems like you're using the orders to equate to sales. Your client made no sales, right? That is not right, Your Honor. Well, how do you define sale, you know, under the trademark act? We have defined sale and we've supported it with case law authorities in our briefing as the passing of title. In this case, our position and Judge Breyer's fact finding was that we made sales of subscription rights to grams. Now, I know there's no delivery of the coins. Well, there's so let me take this in two stages, Your Honor. First, but that's true, isn't it? I mean, it's absent a delivery of the goods. I mean, well, I mean, your position has to be that a sale doesn't require transportation delivery of the goods. No, the question here would be what are the services in question? And if all we had done was execute the purchase agreements, that would be one fact pattern. We don't have that here. What we have here is a couple of things. First, the parties executed the purchase agreements. Second, under the terms of those purchase agreements, the purchasers then, in fact, wired money to my client. Third, under the terms of the purchase agreement, once they wired that $850 million, they then had vested subscription rights to Graham cryptocurrency coins. It is, and I don't mean to be dancing around this, Your Honor, is absolutely the case that at the relevant time period, my client did not deliver the cryptocurrency coins to the purchasers. But what Judge Breyer found, supported by the purchase agreements at issue, was that the services rendered was the transfer of title, if you will, to subscription rights to the tokens. So it's an odd thing where you could say, well, you've transferred these rights to, in this case, I guess it's classified as a service, but you've delivered these rights to something that doesn't exist. Well, the subscription rights exist, Your Honor. I understand. Yes. But let me give you another example. Let's say that it's not yet legal to sell marijuana in California. So we'll go back in time. But you have a client that is selling rights, subscription rights. So if it does ever become legal, they can cash in on their subscription rights to your vested interest, whether it's actual delivery of a product or investment in a field or whatever. So is that kind of pre-sale activity, is that enough for trademark usage when you have a marijuana, which is not legal and it's not on the market? Well, I'm not sure this goes right to the heart of Your Honor's question. But my first response is we've got a legality question and we have a condition precedent issue with the fact pattern just presented to me, neither of which are the case here. I would — look, when we get to the issue of whether orders enough are alone, Judge Murray Gerfine in the 1970s in the Southern District of New York issued the Washington Mint decision. He made a finding that one party had received orders for a bunch of commemorative plates in January of, I think, 1972. He then made a finding that the rival user shipped its plates first, and it did so in March of 1972. Looking at those facts, he then said, I find the party that received orders for goods in January, that was a cognizable use, which beat the actual shipment or sale, Judge DeShima, as I think would be consistent with your line of questioning. I don't see how we're getting the ball down the field very far with this argument. All we have to decide at this point is whether the district judge abused his discretion. We cannot at this point — we're not supposed to at this point make the ultimate decision. I fear that someplace along the line we've got off the track. Judge — the district judge actually stayed the proceedings instead of going ahead with the trial. The purpose of a preliminary injunction is just to hold the time up so you can try the case and not have any change. I think the district judge may be wrong in his position of taking it, granting a stay, to wait to hear what we have to say, because all we have to determine is whether it was an abuse of discretion. Did either party move for that stay, or did he do that sua sponte? If my memory is accurate, Your Honor, that was sua sponte. It was in the context, however, of Telegram, we moved for summary judgment. Right. And I think — I think Judge Breyer was hoping to get some read from this Court. Ah, that's the point. And we've said again and again, don't do that. Don't wait for us because we may well have a different view of it. You should move the case forward. He chose not to follow that, which we've outlined in cases before. And so far as you understand, Judge Breyer did this on his own. There wasn't a motion to stay pending appeal. There was not, Your Honor. So at this case now, what we have before us . . . I'm sorry, go ahead. No, go ahead. It just seems what Judge Wallace is saying, you know, we might not decide anything concrete because we only have to decide the abuse of discretion or serious questions. Let's just say we said at this stage, as Judge Wallace is saying, and I'm not saying we'd go this route, at this stage, we might say no abuse of discretion. But that doesn't answer your summary judgment question, does it? Precisely. And that's why the stay problem was the difficulty that you're running into in extending this litigation for months and extreme costs because we're not following the way that we're supposed to deal with preliminary injunctions. I'm not being critical of you. The Northern District of California has been doing this for some time. We've had two cases in the last year in which we've told them not to do it. And we expect . . . And I like Judge Breyer. I think he's a great guy. He's a good friend of mine. He just . . . My client likes him as well, Your Honor. But I think that if you're hoping this is going to end the case, you shouldn't be very confident of that. And you still have a trial to try, a case to try, unless there's something completely unique which tells us that our prior cases that say don't do this on the preliminary injunction should be . . . there should be an exception. But that has not been briefed or argued here. That has not. And honestly, Your Honor, hearing your comments is the first I've considered the issue. I think the good news for the parties and for both courts is if and when this returns to the district court, the parties . . . I think I can accurately say both parties have suggested or have taken the position that this case is not going to require a whole lot of discovery. Lanta already moved for summary judgment. We've just moved for summary judgment even before fact discovery began. So I can only say if or when we do return to the district court, I believe that it would be reasonable to anticipate an accelerated trial schedule. That'd be fine. You may even get us and you won't have to do the first part of your discussion with this today. Okay. Thank you. Thank you. I think you've exceeded your time. We've given you a fair amount of extra time. Thank you very much. Thank you to the Court. Your Honors, I just want to address a few points that were raised by Mr. Newcomb. In addition to any questions you may have, first of all, I don't believe the record shows that there were 81 orders. I believe the record shows 35 orders, and that's in their complaint, in fact, at ER. Does that matter? No. I mean, some of the trademark cases, there's one order. Yes. That's a small number. But once you start getting up there, 10, 20, 30, so I don't think that would matter. I don't think it's a material difference. I just wanted to correct it. Thank you. Second of all, Telegram did not raise the totality test in its moving papers. It was Lanta that raised that test in opposition for the simple reason that it was, you know, it's a test in this circuit, and I felt like the district court ought to be apprised of that test, and then Telegram addressed it in reply. What I don't want here is I don't want to have to brief another motion for preliminary injunction if they go back to the district court and decide that they want to bring another motion for preliminary injunction raising the test that they didn't raise the first time around. That, you know, again, the purpose... There's always a discomfort among counsel and the court when a standard wasn't raised, and yet it is a standard that might apply. On the other hand, the question is did he in fact apply it implicitly even when he said he wasn't because he was going through all the circumstances that he thought might be appropriate? Okay. So do you think he in fact implicitly applied it? Because he goes beyond just... Yeah. He says he doesn't need to go beyond the sales, but he then does. Well, you know, I'm not sure. Honestly, reading the order, he has a footnote where he says he's not applying that test, but then he clearly goes beyond the, you know, the plain text of the statute. So I don't know. I don't know what he was thinking. So let's say that case goes back, and just for hypothetical purposes, the court is affirmed for now on the preliminary injunction, but then you still have your summary judgment and trial, you know, if you go to trial. Is it your view that on summary judgment, the test to be applied is totality of circumstances? Well, the most recent opinion from this Court is Reardon, and Reardon cites to the bring some of the prior precedent into harmony with the text of the statute. And that's the most recent authority on this subject. I think Reardon would be the case to look to. So I'm asking you, if you go back, the first thing presumably that will happen before trial is the ruling on the summary judgment. And in your summary judgment papers, did you argue that the standard for determination, assuming there's no material issue of fact, is totality of circumstances? What we argued on that motion is that no genuine issue of material fact had been raised on priority. Right. But then what did you tell the district court in terms of benchmarking these no material issues of fact? Did you argue totality of circumstances there? We did raise that argument, yes, in opposition to the motion for a preliminary injunction. No, no. I'm talking now on summary judgment. We filed a single brief on both issues. Okay. Thank you. Okay. Am I over? The other thing just briefly. No, you have a minute and a half. Okay. Washington Mint cites to Mendez. Mendez is a First Circuit opinion that has the language that a trademark must identify and distinguish the marked services in the public mind. And so Mendez is the case that gives rise to that language that has then been cited in all of the subsequent Ninth Circuit opinions on this subject, including New West, including Chance, including Brookfield, including Riordan. And Washington Mint also cites to Mendez. So, you know, I think the parties have a fundamental disagreement on what Washington Mint means. I also don't think it matters because Ninth Circuit precedent is controlling here, and it's quite clear. Also, you know, on the point of transferring money, the other side has said that they wired money, they received money for these orders. I don't think that makes any difference or should make any difference at all. Again, because a trademark resides in mind of the public and signifies goodwill that has been earned in the marketplace. So, you know, a wire transfer from one party to another, no matter the amount, cannot create trademark rights in the mind of the public or goodwill within the marketplace. This Riordan case is a bit of a difficulty for me because in the huge footnote that they left in the case, they talk about a movement away. We don't move away. We change law by going in bank. And so the complexity of it is not going to be easy for the district court to sort out. The complexity of Riordan? Well, Riordan, what Riordan stands for? Riordan cites to the text of the statute. The text of the statute, I think, is quite clear, and it derives from the common law. The common law requires, again, application of a mark to a product or association of a mark with the service and the We do have that. We have the service being the cryptocurrency and this mark. Pardon me? You're on? We have this mark and cryptocurrency. There is no cryptocurrency yet. I understand. Well, maybe you'll have an opportunity to explore this. But I, for one, am somewhat curious that we usually overrule cases that we don't agree with. We don't move away, each panel deciding what they would like to do. So maybe you can help straighten all of that out before this case is over. We'll see about that. Okay. Now I'm over, aren't I? You are. You may conclude. All right. Thank you, Your Honors. Thank you very much. Thank you, both counsel, for interesting arguments and briefing. The case of Telegram Messenger v. Atlanta is submitted.
judges: Wallace, Tashima, McKeown